THOMAS F. JENNINGS, Appellant, v. CITY OF ST. LOUIS, a Municipal Corporation; VICTOR J. MILLER, Mayor; LOUIS NOLTE, Comptroller; WILLIAM G. BUECHNER, Treasurer.—58 S. W. (2d) 979.

Court en Banc, February 23, 1933.

*Case, Voyles & Stemnler* for appellant.

*Julius T. Muench* and *Oliver Senti* for respondents; *B. H. Charles* and *Carl Trauernicht* of counsel.

TIPTON, J.—This is a suit in equity by Thomas F. Jennings, a resident of the city of St. Louis and a taxpayer on real estate therein, to restrain the city of St. Louis, Victor J. Miller, its mayor, Louis Nolte, its comptroller, and William G. Buechner, its treasurer, from

signing, selling, issuing, or delivering bonds totaling $4,600,000 of the city of St. Louis provided for in Ordinances Nos. 39820, 39844, and 39845, on the ground that said ordinances are unconstitutional, null and void. Respondents demurred to the petition, and the demurrer was sustained. The appellant refused to plead further, and his bill was thereupon dismissed and final judgment entered against him and in favor of the respondents. After unavailing motion for new trial appellant duly appealed to this court.

The petition sets out that the various formal steps relating to the passage of the ordinances were all carried out in the proper manner according to law and that the indebtedness is not in excess of the limits prescribed by law for the city of St. Louis. The petition also sets out that the proposition for the issuance of the bonds was properly submitted to the voters at the election held on November 8, 1932, and received more than the two-thirds of the votes cast at the election.

The purposes of the indebtedness as set out in the ordinances are as follows:

"For the purpose of providing for the support, maintenance and care of children, and sick, aged and insane, poor persons and paupers, and for poor relief and of providing and maintaining charitable facilities and services, and containing an emergency clause."

Appellant, in his petition, asserts that, in the event the respondents carry out their expressed intention of issuing and selling the bonds, his property will be subject to taxation for some time to come and that such taxation will be unconstitutional as taking his property without due process of law. In his prayer appellant asks that the respondents be perpetually restrained and enjoined from issuing and selling the bonds.

The petition sets out two grounds for the alleged unconstitutionality of the ordinances, which are as follows:

"(1) That the purpose for which the indebtedness of four million six hundred thousand dollars ($4,600,000) is proposed to be incurred, and the purpose for which the proceeds of the sale of said four million six hundred thousand dollars ($4,600,000) of bonds is to be used is not a 'public purpose' within the meaning of Sec. 3, Article X of the Constitution of Missouri, nor a 'municipal purpose' within the meaning of Sec. 11, Article X of the Constitution of Missouri, nor a 'lawful, public or municipal purpose' within the meaning of Article I, Sec. 1 of the Charter of the City of St. Louis, or Article XVII of the Charter of the City of St. Louis."

"(2) That the said purpose for which said indebtedness is to be incurred and for which the proceeds of said four million six hundred thousand dollars ($4,600,000) of bonds is to be expended is not a purpose for which indebtedness of the City of St. Louis may legally

178

be incurred, nor a purpose for which the funds of the City of St. Louis derived by taxation may legally be spent."

If the issuance of these bonds is not for a "public purpose," then Section 3, Article X of our Constitution is violated because under this section "taxes may be levied and collected for public purposes only."

■ The Legislature has the duty and power to levy taxes and the presumption is that the Legislature will levy a tax only for a "public purpose," and the courts are not justified in interfering except when it clearly appears that the Constitution will be violated by the enforcement of the legislative purpose.

■ While no hard and fast rule can be laid down as to whether or not an enactment of the Legislature is for a "public purpose," yet this court in the case of State ex rel. v. Switzler, 143 Mo. 287 l. c. 317, 45 S. W. 245, approved the test laid down by the Supreme Court of the United States, in the case of Loan Association v. Topeka, 20 Wall. 655, 665, wherein the court said:

"In deciding whether, in a given case, the object for which the taxes are assessed falls upon the one side or the other of this line, they (the courts) must be governed mainly by the course and usage of the government, the objects for which taxes have been customarily and by long course of legislation levied, what objects or purposes have been considered necessary to the support and for the proper use of the government, whether state or municipal. Whatever lawfully pertains to this and is sanctioned by time and acquiescence of the people, may well be held to belong to the public use, and proper for the maintenance of good government, though this may not be the only criterion of rightful taxation."

An examination of the Revised Statutes of Missouri 1929 clearly shows that poor relief is a "public purpose" and a governmental duty because by Sections 12950 and 12952, counties are authorized to spend money in support of the poor; by Section 9986 a county pauper fund is provided; by Sections 12058 and 13942 county poor houses and county hospitals are maintained; Section 9697 gives authority to educate poor children that are blind or deaf; Section 12961 directs the county court to set aside, out of its annual revenues, a definite sum for the support of the poor; Article I, Chapter 90 creates a state board of charities and defines its functions; Section 12930 requires this board to supervise public relief to the poor; Section 12938 authorizes cities to provide for a social welfare board; Section 7330 gives cities under special charter, authority to maintain poor houses and charitable institutions. Also, various sections of these statutes give cities of the first, second, third, and fourth class power to provide funds to care for the poor. Section I, Article I, Paragraph 31 of the Charter of the City of St. Louis is as follows:

"To provide for the support, maintenance, and care of children and sick, aged, or insane poor persons and paupers."

Paragraph 32 authorizes the city:

"To provide and maintain charitable, educational, recreative, curative, corrective, detentive, or penal institutions, departments, functions, facilities, instrumentalities, conveniences, and services."

The appellant concedes that the city of St. Louis has the right, and in fact the obligation to expend its money for the support, maintenance, and care of destitute children and others who may be destitute by reason of sickness, age, insanity, or physical deficiencies. But he contends that the city has no right to spend the taxpayer's money upon persons who may be destitute solely by reason of the present economic situation. He contends that the real purpose of the bonds is to provide for the man who is able-bodied and capable of working, but unable to find work because of the wide-spread unemployment that is prevalent throughout this entire nation of which we take judicial knowledge. [San Francisco v. Collins, 13 Pac. (2d) 912; State ex rel. v. Industrial Commission, 242 N. W. 321.]

The good of society demands that when a person "is without means, and unable, no account of some bodily or mental infirmity, or *other unavoidable cause,* to earn a livelihood," he is entitled to be supported at the expense of the public. "It is immaterial how the alleged pauper is brought into need, as it is the fact of the situation and not the method of producing it that is important." "So the fact that a person's want is the result of gross intemperance does not prevent him from securing relief as a pauper." "An able-bodied man, who can, if he chooses obtain employment which will enable him to maintain himself and family, but refuses to accept employment, is not entitled to public relief, though relief may be properly extended to the wives and children of such men." [21 R. C. L. 705, 706.] It necessarily follows that an able-bodied man, who is unable to obtain employment on account of the economic conditions existing at the time, and who is without means of support is entitled to public relief.

The Supreme Court of Pennsylvania directly passed on this question in the recent case of Commonwealth v. Liveright, 161 Atl. 697, 1. c. 710:

"We again hold that the support of the poor—meaning such persons as have been understood as coming within that class ever since the organization of the Government, persons who were without means of support, the same persons stated in the . . . Bill . . . is and has always been a direct charge on the body politic for its own preservation and protection: and that as such, in the light of an expense, stands exactly in the same position as the preservation of law and order. The expenditure of money by the state for such purposes is in performance of a governmental function or duty, and

is not controlled by the constitutional provision, if the purpose is to supply food and shelter to the poor, including those who are destitute because of enforced unemployment, provided only that the money be not administered through forbidden channels. The appropriation in providing for relief of poor comprehended those who had been driven into that situation through enforced unemployment; they having no means to support themselves. From this cause the ranks of the poor had increased so rapidly as to stagger the people of our state. The fact that their numbers are swollen through unemployment does not change the established concept of poor persons. To hold that the state may not under the Constitution now aid such people, éven though it had a governmental duty, would be to deny to the state the right to perform, not only an important, but at this time a most pressing, governmental function. To hold that the state cannot or must not aid its poor would strip the state of a means of self-preservation, and might conceive untold hardships and difficulties for the future.''

The Supreme Court of the State of Washington, Rummens v. Evans, 13 Pac. (2d) 26, 1. c. 30, said:

''Under our statutes and decisions, therefore, it being a positive governmental function and duty of the country to care for the poor, the statute emphasized by appellant does not govern.''

The court also said:

''Unquestionably, in the stress of these times, when unemployment is the rule rather than the exception and has increased immeasurably, in this state and region, within the last two years, an emergency exists under Sec. 3997-6, supra.''

The opinion closes with these words:

''Upon the plainest dictates of humanity, such a condition must be relieved immediately or in many hundreds of cases it may be too late or useless. . . . While the funds could be accumulated, as suggested by appellants, thuosands of men, women and children might die or be driven to crime to relieve their necessities, or to reprisal and disorder.''

We do not believe that the cases cited by the appellant are in point because the relief extended in those cases was for compensation for the loss of property that was due to some calamity and was not relief to prevent suffering from want of proper care of the people affected by such calamity. Those cases are not an authority for the proposition that the government cannot aid its people, who are unable to provide for themselves, regardless of what caused their condition. The appellant cites the case of State ex rel. v. Osawkee Township, 14 Kan. 418, in support of his position. However, in that case the Legislature undertook to provide the destitute of the township with provisions, and with grain for seed and feed, because of a total crop failure the preceding year. That was compensating those people for

their loss caused by the crop failure, and therefore, the legislative act was for private purpose and not constitutional. To the same effect is the case of William Deering & Co. v. Peterson, 75 Minn. 118, cited by appellant. In that case the legislative act provided loans for seed grain to farmers whose crops had been destroyed by hail or storms in the preceding year. Again, we see that that act was to compensate certain citizens of that state for loss they suffered. The appellant, also, relies upon the cases of Lowell v. The City of Boston, 111 Mass. 454, and Feldman v. City Council of Charleston, 23 S. C. 57. In each of those cases the city undertook to issue bonds and lend the proceeds thereof to citizens whose property had been destroyed by fire, which of course, was not a "public purpose." The appellant also relies upon State ex rel. v. Switzler, supra. That case is distinguishable from the case at bar, for the reason that the act of the Legislature provided aid to certain poor students attending the state university from a fund that was derived from what was commonly called a collateral inheritance tax. The court held that the act endowed the student and not the university, but expressly stated that had the tax gone to the university and not the student it would have been for a "public purpose."

We, therefore, hold that the ordinances authorizing the issuance of these bonds are for a "public purpose." They undertake to provide relief for people of the city of St. Louis who are unable to care for themselves, and to relieve them of their condition, and it is immaterial what caused their condition.

As a municipal purpose, poor relief is recognized by our Legislature in the creation of social welfare boards and in express grants of authority to all of our cities to care for the poor. In Paragraphs 31 and 32 of Article I, Section I of its Charter, this power is expressly conferred upon the city of St. Louis. Poor relief being a municipal purpose, under Section 11, Article X, of the Constitution of Missouri, the city of St. Louis has the power to levy taxes so that its poor may be fed, clothed, and sheltered.

The appellant questions the power of the city of St. Louis to borrow money for purposes for which these bonds will be issued. Section 7217, Revised Statutes 1929, gives the city authority to borrow money in excess of its annual revenue for any such year, for *any purpose authorized in its charter.*

In the recent case of Dysart v. City of St. Louis, 321 Mo. 514, l. c. 526, 11 S. W. (2d) 1045, we said:

" 'It is further contended that the city of St. Louis is without power to borrow money for the purpose of acquiring and maintaining an airport, even though such purpose be both public and municipal. This contention is disposed of by our holding that the power to establish and maintain an airport is conferred upon the city by its charter, for by Section 8656, Revised Statutes 1919, any city in this State

may contract a debt in excess of annual income *for any purpose authorized in its charter,* upon the assent of two-thirds of the legal voters of such city at an election held for that purpose, and by Section 8659, Revised Statutes 1919, as amended by the Laws of 1927, page 318, may issue bonds covering the amount of such debt. It also appears that the power to issue the bonds in question is conferred by Section I of Article XVII of the Charter. The relevant charter provisions, as well as the applicability of the statute, with reference to the city's authority to issue bonds, are fully considered in Halbruegger v. St. Louis, supra, and what is there said is apposite here. For that reason a further elaboration of the question in hand is deemed unnecessary.' The above quotation from Judge RAGLAND's opinion satisfactorily disposes of the points considered."

It appears that the power to issue bonds is given the city of St. Louis by Section I, Article XVII, of its Charter. We have already held that the city has authority under its charter to spend public funds for poor relief and it follows that it is authorized to borrow money for that purpose.

The ordinances authorizing this bond issue coincide with Paragraphs 31 and 32 of Article I, Chapter I, of the Charter of the City of St. Louis, with the exception that the ordinances add the words "poor relief." This phrase comes within purview of this section of the charter and is, therefore, not open to the criticism that the ordinances are broader than the powers granted the city by its charter.

The demurrer was properly sustained. The judgment is, therefore, affirmed. All concur, except *Leedy, J.,* not sitting.